IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 3, 2021

**MELVIN HOPKINS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-02392          W. Mark Ward, Judge**

_____

**No. W2020-00420-CCA-R3-PC**

_____

The petitioner, Melvin Hopkins, appeals the denial of his post-conviction petition arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial.  Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Shea Atkinson, Memphis, Tennessee, for the appellant, Melvin Hopkins.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

**I.      Trial Proceedings**

The petitioner, Melvin Hopkins, was convicted by a Shelby County Criminal Court jury of two counts of first-degree felony murder and one count each of aggravated robbery and especially aggravated kidnapping, for which he received an effective sentence of life in confinement.  On direct appeal, this Court set forth the relevant facts as follows:[1]

_____

[1] Due to the length of the trial court testimony, we have only included those facts relevant to the issues raised on post-conviction and on appeal.

At trial, Lenwood Reed testified that he knew the victim for one year to eighteen months, that they met "through ministry," and that he talked with the victim on a regular basis. Reed last saw the victim on or about July 24, 2012, and the victim did not complain about any health issues. On the evening of July 25, the victim contacted Reed because he owed Reed $100. The victim told Reed that Reed could come to the victim's apartment to get the money, and Reed told the victim that he would come after work. When Reed got off work about 10:30 p.m., he telephoned the victim. Reed said "[a] young man" answered and told him the victim was not there. Reed responded that the victim had to be there because the victim did not go out at that time of night. The young man said the victim had gone to the store and hung up. Reed telephoned the victim again, but the call went to voicemail.

Reed testified that the call "stayed on" his mind. The next morning, he and a friend went to the victim's apartment building. The apartment manager took them to the victim's apartment, and a maintenance man "popped the door open." Reed went inside and saw that the apartment had been "ransacked." He could hear the victim moaning and found the victim lying on the bathroom floor. The victim was swollen, and blood was on his face. Reed said the victim looked "[t]otally different" from the victim's appearance on July 24.

Reed testified that he visited the victim in the hospital on July 27 and that the victim did not respond to him. A couple of days later, Reed visited the victim again. The victim did not recognize Reed and still did not respond. Reed visited the victim after the victim was transferred to long-term care but never got a response from him.

. . .

Officer Michael England of the Memphis Police Department (MPD) testified that about 10:30 a.m. on July 26, 2012, he and another officer responded to a call at the victim's apartment and went to the front door of the building. He stated, "I don't remember if that [door] had a buzzer or not. I think we just walked in." The officers went to the victim's apartment on the seventh floor, and Officer England saw fire department personnel bringing out the victim on a gurney. The victim was wearing a neck brace and an oxygen mask, had blood on his face, and was making "a gurgling sound." Officer England tried to ask the victim a question, but he was unresponsive.

On cross-examination by counsel for [the petitioner], Officer England testified that he spoke with the victim's neighbor, who said he heard "banging coming from down the hall" about 9:00 p.m. The neighbor stepped out of his apartment and saw two males walking away from the area of the victim's apartment and toward the elevators. One of the males was wearing a white t-shirt, and the other was wearing "a green jersey style shirt." The neighbor did not see their faces because they had their backs to him. Officer England also spoke with a maintenance man, who showed him damage to the victim's front door. The maintenance man had "dismantle[d] the door" to gain entry to the victim's apartment. Officer England did not inspect the back door of the apartment building.

James Schafer, a retired sergeant from the MPD, testified that he investigated the case and went to the victim's apartment about 11:30 a.m. on July 26, 2012. Other officers were present, and the victim had been transported to a hospital in critical condition. The knob on the front door of the apartment was missing, and the door's lock had been damaged. Sergeant Shafer entered the apartment through the kitchen and noticed that cabinet drawers and doors were open. He went into the living room and saw what appeared to be blood. "[M]ore blood" was in the bedroom, and the bedroom door had "a large dent in it." Sergeant Shafer entered the bathroom and noticed a large amount of blood and two neckties. He said the entire apartment had been ransacked as if "[s]omebody was searching for something."

Sergeant Shafer testified that another officer already had "pulled" video of two potential suspects. Sergeant Shafer viewed the video, which was recorded on July 25, and it showed two males entering the back door of the victim's apartment building. One of them "had taken his shirt and covered up his face as if not wanting to be seen or identified." Sergeant Shafer obtained a still photograph of the suspects from the video and released it to the media. One or two days later, Robert Armstrong, who had turned fifteen years old on July 25, and Jerrico Ware, who was seventeen years old and Armstrong's cousin, came to the police department and spoke with Sergeant Shafer. Ware admitted that he was the individual in the video with the shirt covering his face. However, he claimed he was not present when the victim was assaulted. Armstrong gave an incriminating statement to Sergeant Shafer. Based on Armstrong's statement, Sergeant Shafer began looking for the [the petitioner, Ashton Buford, Devante Terrell], and Terrell Vaughn.

- 3 -

Sergeant Shafer testified that he viewed a second video from the apartment building and that the second video was recorded earlier on July 25 than the first video. The second video showed four suspects entering the back door of the building and was consistent with Armstrong's statement.

The State played the second video for the jury. Sergeant Shafer testified that the video showed Robert Armstrong entering the building first, followed by [Co-defendant] Terrell, who was wearing a backpack; [Co-defendant] Buford; and [the petitioner]. Although the door to the building had a security system, the system was broken so that they just "had to pull on it a couple of times to get in." The State then played a third video, which showed the four of them getting onto an elevator on the ground floor of the building and the elevator doors closing. An electronic indicator above the doors showed that the elevator went up to the seventh floor, the floor on which the victim's apartment was located. Less than five minutes later, the elevator doors opened on the ground floor, and the four males exited the elevator. Sergeant Shafer said that when [Co-defendant] Terrell exited the elevator, "it's obvious that [his backpack] has some stuff in it as compared to when they first went up."

Sergeant Shafer testified that the police arrested [Co-defendant] Buford and brought him to the police department. Sergeant Shafer advised [Co-defendant] Buford of his rights, and [Co-defendant] Buford agreed to speak with him. During the interview, [Co-defendant] Buford admitted being involved, stating, "I was searching the front room near the couch for more money. I went into the refrigerator and got some juice and oatmeal pies . . .. [The victim] wasn't saying anything but it sounded like he was snoring." Sergeant Shafer asked [Co-defendant] Buford if he was concerned about the victim at that time, and [Co-defendant] Buford answered, "No, sir. I was just trying to get out and leave." [Co-defendant] Buford said that the victim was lying on the bathroom floor, that the victim "only had a couple of knots on his face," and that he never sought help for the victim. Sergeant Shafer asked [Co-defendant] Buford "[e]xactly how much money and what other property" were taken from the victim, and [Co-defendant] Buford answered, "$141 and some food." [Co-defendant] Buford did not know the victim prior to July 25.

. . .

Sergeant Shafer testified that [Co-defendant] Terrell turned himself in to the police, that he advised [Co-defendant] Terrell of his rights, and that he

interviewed [Co-defendant] Terrell. [Co-defendant] Terrell said he learned from Terrell Vaughn that the victim "was going to get some money." [Co-defendant] Terrell telephoned the victim, and the victim thought [Co-defendant] Terrell was Terrell Vaughn. [Co-defendant] Terrell told the victim that he would "be over there about seven or eight." [Co-defendant] Terrell went to the victim's apartment and knocked on the door. When the victim opened it, [Co-defendant] Terrell "just busted in on him." The victim was yelling, "[S]top hitting me, what you hitting me for[?]" Blood was coming out of his mouth, and he was "breathing hard." [Co-defendant] Terrell said he was concerned about the victim because "there was too much blood coming out of his mouth." [Co-defendant] Terrell said he took $140, a telephone, and "juices" from the victim and that the items were in his backpack. He said he did not know the victim and had not been in the victim's apartment prior to July 25.

. . .

Sergeant Shafer testified that he initially charged the [co-defendants] and Armstrong with especially aggravated robbery and especially aggravated kidnapping. However, the victim died on September 30, 2012, so Sergeant Shafer added charges of first- degree murder. He said he never obtained a statement from the victim because the victim never regained consciousness after July 25.

. . .

On redirect examination, Sergeant Shafer described the victim's assault as "brutal." He said that the victim was beaten with hands, not a weapon, and that the victim suffered due to the attack.

. . .

Carolyn Washington, the victim's daughter, testified that the victim was diagnosed with sarcoidosis of the lungs when he was "in his 30s," an enlarged heart in 2006 or 2007, and HIV in 2009. She said she saw him about twice per week and talked to him on the telephone every day. On July 25, 2012, Washington took the victim to run errands, and he walked his two granddaughters to the park. He was not having any trouble walking or talking that day. About 9:00 a.m. on July 26, Washington received an emergency telephone call from one of the victim's friends. She said she was "shocked" by the call because the victim was "fine" the previous day.

Washington testified that she went to the hospital and that the victim's "face and everything was just swollen and his eyes [were] swollen shut and [he] had a collar around his neck." Washington talked to the victim, but he did not recognize her and would not respond. He tried to open his eyes, but they were too swollen. He had a tube in his throat that was connected to a breathing machine, a tube in his stomach because he could not feed himself, and a catheter. Washington said, "Every now and then he was there but he wasn't there." She stated that the victim "was constantly trying to get away because he [was] thinking someone was coming for him," that he pulled the tubes out of his body, and that he had to be restrained. At some point, the victim indicated that he wanted the breathing tube out of his throat, so doctors removed it and performed a tracheotomy. Washington said that the bones in the victim's face were broken and that she heard "rattling noises" when he moved his head.

Washington testified that two weeks later, the victim was moved into long-term care at a second hospital. The ultimate goal was to move him into rehabilitation so that he could learn to walk and go home. However, one of his eyes became infected and did not improve. The victim had an "eye issue" prior to July 25 due to his HIV. An infection developed in his bloodstream, and he was transferred to hospice care. One night, the victim vomited into his trachea. Washington said that "he just turned for the worst and everything started to just shut down and everything started to get worse." On September 29, the victim had a seizure that lasted more than one hour, and his doctor told Washington that the victim's heart had "started to fade." The victim died the next day, September 30, 2012. Washington said that he never was able to talk after July 25 but that he could respond to her by grabbing her hand or making noises. She said Sergeant Shafer would have been unable to have taken a statement from the victim.

On cross-examination by counsel for [Co-defendant] Buford, Washington testified that prior to July 25, the victim also suffered from sinus problems and asthma and was taking nine or ten medications per day. He received a disability check every month, and he fixed televisions in his apartment "[o]n the side." The victim had a roommate briefly, but Washington never met him. On July 26, 2012, Washington's mother also went to the hospital, and the victim recognized her. After three or four days in intensive care, the victim recognized Washington. Washington said she would talk to the victim about his medical care and that she thought he understood her because he would squeeze her hand to respond "yes" and

- 6 -

shake his head to respond "no." However, by the time he was moved out of long-term care, "he was a vegetable."

On cross-examination by counsel for [the petitioner], Washington acknowledged that she knew the victim had a staph infection on his knee prior to July 25 but said that she did not know he had been diagnosed with a zygomatic fracture of his cheekbone, dizziness, and chronic kidney disease. She acknowledged that while the victim was in the hospital, he tried to sit up and stand up.

On cross-examination by counsel for [Co-defendant] Terrell, Washington testified that she did not know the victim had broken his cheekbone one month before this incident. She acknowledged that while the victim was in the hospital, he seemed to improve for a while but then "took a turn for the worse."

Eighteen-year-old Robert Armstrong testified that on July 25, 2012, he turned fifteen years old. [Co-defendant] Terrell was nineteen years old, and [Co-defendant]s Hopkins and Buford were eighteen. Armstrong was "real close" with [Co-defendant] Terrell, and [Co-defendant]s Terrell and Buford were good friends.

Armstrong testified that a couple of weeks before the victim was attacked, Armstrong overheard Terrell Vaughn tell [Co-defendant] Terrell that the victim was going to receive "a double check." On July 25, Armstrong and the [co-defendants] were together "drinking, swimming, [and] playing basketball," and [Co-defendant] Terrell mentioned the victim's check. The four of them developed a plan to rob the victim of cash and "anything else of value." Armstrong and [the petitioner] were to stand just inside the doorway of the victim's apartment while [co-defendants] Terrell and Buford went into the apartment and hit the victim with their fists. Armstrong and [the petitioner] were to go inside when they heard noises.

Armstrong testified that the four of them went to the victim's apartment and that he and [the petitioner] stood at the front door until they heard heavy objects being moved. They "assumed that it was a body" and entered the apartment. The victim was lying on the living room floor, was awake, and was saying, "[H]elp." The victim did not appear to have any injuries, and Armstrong went into the victim's bedroom. Armstrong "started looking around for stuff, started raising up mattresses, going inside shelves, just anything" and found two cellular telephones.

Armstrong testified that [Co-defendant] Buford beat the victim's face with his fists "[a]bout eight times" and that the victim "went unconscious." [Co-defendant] Terrell said, "Go in his pockets and get the money." [Co-defendant] Buford "[got] off" the victim, and [the petitioner] took the victim's wallet out of the victim's pocket and removed $140. [The petitioner] then dragged the unconscious victim from the living room into the bathroom, and Armstrong saw a lot of blood coming out of the victim's mouth. The State asked if Armstrong was concerned about the victim at that time, and Armstrong said no because "I was trying to get out of there." [The petitioner] tied up the victim with neckties, and the four of them left. They took the two telephones, the money, some keys, a few t-shirts, some oatmeal cream pies, and some juice. The items were in [Co-defendant] Terrell's backpack. Each of them received twenty dollars, and they spent the rest of the money on marijuana.

. . .

Erica Curry testified as an expert in forensic pathology that she performed the victim's autopsy. The victim's hospital records indicated that the following bones were broken in his face: his upper left jaw, both cheekbones, the bones "close to his jaw in the back," the bones surrounding his sinuses, his frontal and maxillary sinuses, his eye sockets, and his hard palette. The victim's fractures were caused by blunt force trauma. On July 31, 2012, surgeons "put plates and screws" in the victim's face to stabilize and align the bones for healing.

Dr. Curry testified that in addition to the fractures, the victim had bleeding behind his eyes, which caused his eyes to bulge, and bleeding in his sinuses. An MRI showed hemorrhaging on both sides of his brain, and the bleeding would have affected his brain's function. Physician notes stated that the victim suffered a "'traumatic brain injury.'" Dr. Curry said the notes indicated that the victim "was unconscious and he would go in and out of being alert and knowing his surroundings, to being unresponsive with not knowing where he was."

Dr. Curry testified that the victim had the following pre-existing conditions: Sarcoidosis; AIDS, not HIV; hypertension; chronic obstructive pulmonary disease; and chronic sinusitis. She explained that a person, such as the victim, with significant underlying disease would have more difficulty recovering from injuries than a healthy person. Tubes in a person's throat

and stomach also "sets them up for infection," and a person with AIDS could not fight off infections like a normal person. After the victim's surgery on July 31, he developed bedsores and an infection in his eyes. He then developed sepsis, an infection in his blood. Dr. Curry explained that people with head trauma had an increased risk for seizures and that the victim had a seizure on September 29. He died on September 30. Dr. Curry said she determined that "his cause of death meaning the initiating event that led to his death was the blunt head trauma."

On cross-examination by counsel for [Co-defendant] Buford, Dr. Curry testified that she did not recall seeing in the victim's hospital records that he was diabetic. She said that she saw bedsores on his buttocks during the autopsy but that they "weren't that bad." She also saw scrapes on the victim's back, left ear, right shoulder, and right arm and multiple scars on his arms and legs. Discoloration of the victim's lungs indicated he probably smoked. Dr. Curry said the victim's toxicology tests were positive for Lorazepam, which was often used for sedation or to treat seizures, and morphine for pain.

On cross-examination by counsel for [the petitioner], Dr. Curry acknowledged that the victim's heart was enlarged and that he suffered from chronic kidney disease and possibly diabetes. His medical records showed that he had a staph infection in June 2012. Regarding his pre-existing conditions, Dr. Curry stated that the victim "was not well" prior to July 25 and that the conditions "didn't make the injury that he received any better for him to heal from."

On cross-examination by [Co-defendant] Terrell, Dr. Curry testified that the victim did not have any skull fractures. He also did not have any bleeding of his brain at the time of the autopsy. His brain had some swelling but was normal otherwise. Dr. Curry acknowledged that the victim's hospital records listed twelve medical conditions at the time of his death and that "respiratory failure" was listed first while "history of traumatic brain injury" was listed twelfth. Dr. Curry said the list was insignificant to her regarding the victim's cause and manner of death. She explained:

So there is a such thing as the cause of death like I said which is the initiating chain of events and then there is a such thing as the proximate cause of death, meaning the thing that caused the death immediately. So what hospital clinicians tend to do is list all the diagnoses that they think caused the immediate cause of death. And so they just go through

and they list everything.  And then a lot of times they don't even list things in order of importance.  To them it's just a running list of what they can look at and document in the chart.  So to me it doesn't have any significance.

On redirect examination, Dr. Curry testified that a normal, healthy person would have been able to recover from the victim's injuries.  However, the victim's age and underlying medical conditions made his injuries more significant.  Dr. Curry acknowledged that the victim would not have been in the hospital if he had not been beaten.  At the conclusion of Dr. Curry's testimony, the State rested its case-in-chief.

. . .

Seventeen-year-old Terrell Vaughn testified for [Co-defendant] Terrell that he was fourteen years old in July 2012 and that he used to play basketball in the park with the [defendants].  He said the victim would sit on a bench at the basketball court, watching people play basketball.  One day, the victim bought a drink for Vaughn, and Vaughn sat on the bench.  Vaughn said that the victim offered to buy him a pair of shoes and that he thought the victim was trying to be "like a mentor or something."  Vaughn stated that the victim invited him to the victim's apartment a few times and that the victim "came on to him" sexually in the apartment.  One time on the basketball court, the victim tried to touch Vaughn's lower back while Vaughn's shirt was off.  Vaughn said, "I knocked his hand out and I told him I don't get down like that."  Vaughn acknowledged that he was mad at the victim for trying to touch him, that he wanted to "punch" the victim, and that he told [Co-defendant] Terrell about the victim's behavior.  On July 25, 2012, Vaughn saw Robert Armstrong and the [defendants] at the Citgo gas station, but Vaughn did not talk to Armstrong.  He said he did not remember saying in his statement to police that Armstrong showed him a telephone that Armstrong had taken from the victim.

. . .

Sergeant Jerry Chatman of the MPD testified on rebuttal for the State that he helped interview Terrell Vaughn on July 31, 2012.  The State had him read Vaughn's statement to the jury as follows: Vaughn "figured out a couple [of] weeks ago" that the victim was "gay."  The victim was "constantly making gay comments" to Vaughn, and Vaughn "was tired of his comments."  Vaughn told [Co-defendant] Terrell about "how [the victim]

tried [Vaughn]," and [Co-defendant] Terrell asked if the victim had some money. Vaughn told [Co-defendant] Terrell that the victim received checks every month. Vaughn last saw the victim at the end of June; the victim was walking across the park with his grandchildren. One day the week before Vaughn gave his statement, Vaughn was on the basketball court with Jerrico Ware, [Co-defendant] Terrell, and Robert Armstrong and told them that the victim was going to receive his check in a couple of days. [Co-defendant] Terrell, Ware, and Armstrong started "saying they was going to go beat" the victim. On July 25, Vaughn was with Ware and saw [Co-defendant] Terrell and Armstrong come out of [Co-defendant] Buford's house. About forty minutes later, Vaughn saw "them" at the Citgo, and "[t]hey" were all laughing. Vaughn asked what happened, and [Co-defendant] Terrell told Vaughn that he "just beat the old dude named Jessie" and took the victim's wallet. [Co-defendant] Terrell was carrying a backpack and asked if Vaughn wanted to buy something out of the backpack. Vaughn told him no. Vaughn "asked where they got that from and [[Co-defendant] Terrell] said they got it when they beat Jessie." [Co-defendant] Terrell showed the victim's wallet to Vaughn and said the victim was "beat real bad and bleeding out his mouth." Armstrong told Vaughn that he went through the victim's belongings and took the victim's cellular telephone. Armstrong showed the telephone to Vaughn.

Sergeant Chatman testified that after he took Vaughn's statement, he typed it out for Vaughn. He said that suspects and witnesses were shackled to a bench during interviews for officer safety but that they were offered food and water and allowed to go to the bathroom. He said he was "sure" Vaughn received those same opportunities.

On cross-examination by counsel for [Co-defendant] Buford, Sergeant Chatman testified that he did not know how long Vaughn was shackled to the bench prior to giving his statement but that it was probably more than one hour. Vaughn spoke with the officers for at least another hour, and then Sergeant Chatman had to type Vaughn's statement.

On cross-examination by counsel for [the petitioner], Sergeant Chatman testified that Vaughn was fourteen years old at the time of the interview and was not free to leave. Vaughn's mother gave permission for the interview, and a female family member was present during the interview. Sergeant Chatman said he did not know if the family member was a high school graduate of if she could read or write. Sergeant Chatman said Vaughn "seemed competent and aware of what was going on and aware of what he

was doing and why he came down." Sergeant Chatman acknowledged that Vaughn appeared to be of average intelligence for his age and that Vaughn signed the statement after Sergeant Chatman read it to him.

At the conclusion of Sergeant Chatman's testimony, the jury convicted the [defendants] as charged of first-degree felony murder committed during the perpetration of or the attempt to perpetrate robbery in count one; first-degree felony murder committed during the perpetration of or the attempt to perpetrate kidnapping in count two; aggravated robbery, a Class B felony, in count three; and especially aggravated kidnapping, a Class A felony, in count four. The trial court immediately sentenced the [defendants] to life for the murder convictions. After a sentencing hearing, the trial court merged the murder convictions and sentenced [Co-defendant] Buford to concurrent sentences of twelve years for aggravated robbery and fifteen years for especially aggravated kidnapping and [co-defendants] Terrell and Hopkins to concurrent sentences of eight years for aggravated robbery and fifteen years for especially aggravated kidnapping.

*State v. Ashton Buford, et al.*, No. W2016-01387-CCA-R3-CD, 2018 WL 1182908, at *1–11 (Tenn. Crim. App. Mar. 7, 2018), *perm. app. denied* (Tenn. July 19, 2018).

## II.      Post-Conviction Hearing

On January 30, 2019, the petitioner filed a petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition in which he claimed trial counsel was ineffective for, among many reasons, failing to review discovery with the petitioner, failing to communicate with the petitioner, failing to adequately investigate the petitioner's case, and failing adequately advise the petitioner concerning his right to testify and preparing him to testify. A hearing on the petition was held on February 7, 2020.

The first witness to testify during the post-conviction hearing was the petitioner's trial counsel. Trial counsel testified he received discovery from the State and reviewed it with the petitioner. In doing so, trial counsel met with the petitioner several times and reviewed the State's evidence against the petitioner, including the petitioner's statement and the statements of his co-defendants.

While trial counsel did not hire an investigator, he testified that counsel for one of the co-defendant's had hired an investigator and shared all of his information with trial counsel. In addition to reviewing the information provided by the co-defendant's investigator, trial counsel and the petitioner reviewed the victim's medical records. Based on trial counsel's review of the discovery, the investigator's report, the victim's medical

records, and his conversations with the petitioner, trial counsel concluded his best trial strategy was to argue that the petitioner played a minor role in the crime and that the victim died as a result of his pre-existing medical conditions and not as a result of the attack by the petitioner and his co-defendants.

When trial counsel was questioned as to why he opposed Co-defendant Burton's motion to sever, he initially testified he could not remember. However, upon further discussion, trial counsel stated that he did not file a motion to sever and did not join the co-defendant's motion, because if the cases were severed, he would not have been able to "point the finger" at the co-defendants or argue the petitioner's minor role in the incident.

Next, the petitioner testified that while he received discovery from trial counsel, trial counsel never reviewed the discovery with him, claiming he did not meet with trial counsel until the day of trial. The petitioner also testified that he never met with the investigator hired by his co-defendant. Additionally, the petitioner claimed that he wanted to be tried separately. While the petitioner claimed trial counsel failed to fully advise him as to whether or not he should testify, the petitioner stated that he chose not to testify after hearing the proof presented by the State because he did not think his testimony would have made a difference.

On February 14, 2020, the post-conviction court entered a written order denying the petition for post-conviction relief. This timely appeal followed.

### *Analysis*

On appeal, the petitioner contends the post-conviction court erred in finding he received the effective assistance of counsel. Specifically, the petitioner argues trial counsel was ineffective for failing to investigate, failing to prepare him and his case for trial, and for not joining his codefendant's motion to sever. The State submits the petitioner failed to meet the burden required of him, and therefore, is not entitled to relief. Upon our review of the record and the applicable law, we affirm the ruling of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

- 14 -

A. Communication, Discovery, and Pre-Trial Investigation

The petitioner argues trial counsel was ineffective for failing to review discovery with him, failing to investigate the petitioner's case, and failing to discuss trial strategy with the petitioner. The State submits the post-conviction court correctly determined that trial counsel provided effective assistance and that the petitioner has not met his burden of showing deficient performance and prejudice. We agree with the State.

Initially, we note that the post-conviction court accredited the testimony of trial counsel over that of the petitioner. More specifically, throughout its written order denying the petition, the post-conviction court made the following statements, "[t]his court does not believe the [p]etitioner's claim that counsel went to trial without ever discussing the case with him" and "this [c]ourt finds the [p]etitioner's claim that he never met with trial counsel prior to trial to be unworthy of belief." Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and this Court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001).

In addition to finding the petitioner's testimony not credible, the post-conviction court also found the petitioner failed to establish, or even argue, how he was prejudiced by trial counsel's actions. As found by the post-conviction court, the petitioner failed to demonstrate how more or different communication would have affected the outcome of his case, failed to "demonstrate any 'prejudice' as a result of his claim" concerning the review of discovery, and failed to demonstrate "what a 'proper' investigation would have revealed." Our review of the record supports the conclusions reached by the post-conviction court. While the petitioner alleges counsel was ineffective for not reviewing discovery with him, not communicating with him, and for failing to conduct a proper pre-trial investigation, the petitioner failed to offer any proof or argument as to what counsel would have discovered had he conducted these things in a different manner or how the outcome of his case would have been different. Thus, the petitioner has failed to establish the prejudice prong of the *Strickland* standard and is not entitled to relief.

B. Trial Strategy and Preparing the Petitioner to Testify

Next, the petitioner contends trial counsel was ineffective for failing to develop a sound trial strategy and failing to advise the petitioner of his right to testify and/or adequately prepare him to testify. However, as found by the post-conviction court, the petitioner has failed to establish how he was prejudiced by trial counsel's actions.

- 15 -

The petitioner claims trial counsel should have met with him "in advance of trial to prepare him to testify, discuss questions and answers if he decided to testify, and fully prepare [the petitioner] so he would know what to expect." However, the only proof offered during the post-conviction hearing relating to the petitioner's claim was trial counsel's testimony, which the post-conviction court accredited, that trial counsel advised the petitioner concerning his right and recommend the petitioner testify, and the petitioner's testimony that he chose not to testify because it would not make a difference. Neither during the post-conviction hearing nor in his brief on appeal has the petitioner presented an argument as to what trial counsel should have done or as to how the outcome of his case would have been different. Thus, the petitioner has failed establish deficient performance or prejudice and is, therefore, not entitled to relief.

The petitioner also contends trial counsel failed to develop a sound trial strategy. Again, as found by the post-conviction court, the record does not support the petitioner's claim. Trial counsel testified that after reviewing all the discovery, including the defendant's statement, his co-defendant's statements, and the victim's medical records, his trial strategy was to focus on the petitioner's minor role in the assault on the victim and argue the victim died as a result of his pre-existing medical conditions and not the assault. In addition to noting that the petitioner failed to offer any alternative theories, the post-conviction court pointed out that the petitioner was captured on video at the scene, a co-defendant implicated the petitioner, and the petitioner "essentially confessed." Accordingly, the petitioner has not and cannot establish how he was prejudiced by the strategy presented by trial counsel and is not entitled to relief.

C. Motion to Sever

Finally, the petitioner contends trial counsel was ineffective for objecting to the motion to sever filed by his co-defendant. However, as found by the post-conviction court, trial counsel testified that he opposed the motion to sever in order to emphasize the petitioner's lesser role in the crimes and allow him to "point the finger" at the petitioner's co-defendants. Despite the petitioner's complaint, he has failed to show, or even argue, how the outcome of his case would have been different if he had been tried separately. This Court will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

Additionally, the petitioner has failed to establish the motion to sever would have been granted had counsel not objected to the motion. As found by the post-conviction court, "the trial court denied the motion to sever for legal reasons that would not have been

affected merely by the position of the [petitioner's] trial [counsel]." Accordingly, the petitioner has failed to establish the prejudice prong of *Stickland* and is not entitled to relief.

### *Conclusion*

Based on the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
J. ROSS DYER, JUDGE